TRINITY INDUSTRIES,
INC., Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civil Action No. 3:06–CV–0726–N.

United States District Court,
N.D. Texas,
Dallas Division.

Jan. 29, 2010.

Robert D. Albergotti, Jason Bradley Binford, Mark J. Elmore, Haynes & Boone, Dallas, TX, David S. Bland, Taylor M. Norton, Leblanc Bland PLLC, Douglas S. Draper, Leslie A. Collins, Warren Horn, Heller Draper Hayden Patrick & Horn, New Orleans, LA, for Plaintiff.

Michael D. Powell, Herbert W. Linder, U.S. Department of Justice, Dallas, TX, for Defendant.

## *ORDER*

DAVID C. GODBEY, District Judge.

This matter came on for trial before the Court on March 31, 2009 through April 3, 2009. This Order constitutes the Court's findings of fact and conclusions of law.

### I. Introduction

This is a tax refund suit. Trinity Industries, Inc. ("Trinity") seeks a refund for certain qualified research expenditure ("QRE") tax credits it claims were wrongly disallowed for its tax years ending in March of 1994 and 1995[1] (the "Tax Years"), pursuant to IRC § 41.[2] Although Treas. Reg. § 1.41–4 was formally adopted after the tax years in question, both sides agree that it is authoritative. Both sides also agree that Trinity bears the burden of proving its entitlement to the credits. From there, the parties diverge.

---

1. Trinity originally also claimed credits for 1996, but has since dropped that claim.

2. The Court will cite to Title 26, United States Code, as "IRC." The Court will cite to the corresponding regulations found in Title 26, Code of Federal Regulations, as "Treas. Reg."

Trinity is a large corporation engaged in a variety of businesses. Over time, Trinity has acquired and divested various other businesses. Some of these businesses were incorporated subsidiaries, and some were unincorporated constituent elements of Trinity. The expenditures at issue here were incurred by a division of Trinity sometimes called Trinity Marine Group ("TMG"). In 1987, Trinity formed TMG to serve as an umbrella for Trinity's marine activities, later including the Halter Marine Division. Trinity acquired Halter Marine, Inc., an independent corporation, in 1983. Trinity dissolved Halter Marine in April 1988, which had the effect of merging Halter Marine into Trinity and TMG. Halter Marine operated as an unincorporated division of Trinity and TMG. After the Tax Years, Trinity incorporated the Halter Marine Group, Inc. to facilitate a spin-off of the Halter Marine and related assets.

TMG did not always scrupulously observe corporate formalities. Through use of old paper forms and force of habit, it continued to use the Halter Marine name in the conduct of its business, even entering into contracts in the name of Halter Marine, Inc. Notwithstanding these paperwork lapses, the Court finds that all of the expenditures at issue in the Tax Years were incurred by TMG as an unincorporated division of Trinity and properly reportable in Trinity's consolidated returns.

TMG in the Tax Years was in the business of shipbuilding. Halter Marine began building work boats that serviced offshore drilling rigs and wells. By the Tax Years, TMG had expanded into many other market segments for shipbuilding. TMG used a design methodology it called the design spiral, consisting of six phases: conceptual, contract design, functional design, detail design, construction, and testing. When TMG designs a new type, or class, of ship, the first one is called "first in class." A first in class ship is essentially a prototype. TMG's hope is that many more will be built that are substantially duplicates of the first in class, but there is no guarantee of that. The claimed QREs here were primarily related to design and construction of first in class ships designed and built under contracts for various customers.

At issue are six projects:

1. Mark V
2. Extra–Fast Patrol Boat ("XFPB")
3. Oceanographic Survey Ship T–AGS 60
4. Dirty Oil Barge
5. Hurley Dredge
6. Crew Rescue Boat

## II.  QRE SUMMARY

### A.  *Statutory Overview*

IRC § 41(d) defines qualified research as follows:

(d) Qualified research defined.—For purposes of this section—

(1) In general.—The term "qualified research" means research—

(A) with respect to which expenditures may be treated as expenses under section 174,

(B) which is undertaken for the purpose of discovering information—(i)

(i) which is technological in nature, and

(ii) the application of which is intended to be useful in the development of a new or improved business component of the taxpayer, and

(C) substantially all of the activities of which constitute elements of a process of experimentation for a purpose described in paragraph (3).

Such term does not include any activity described in paragraph (4).

(2) Tests to be applied separately to each business component.—For purposes of this subsection—

(A) In general.—Paragraph (1) shall be applied separately with respect to each business component of the taxpayer.

(B) Business component defined.—The term "business component" means any product, process, computer software, technique, formula, or invention which is to be—

(i) held for sale, lease, or license, or

(ii) used by the taxpayer in a trade or business of the taxpayer.

(C) Special rule for production processes.—Any plant process, machinery, or technique for commercial production of a business component shall be treated as a separate business component (and not as part of the business component being produced).

(3) Purposes for which research may qualify for credit.—For purposes of paragraph (1)(C)—

(A) In general.—Research shall be treated as conducted for a purpose described in this paragraph if it relates to—

(i) a new or improved function,

(ii) performance, or

(iii) reliability or quality.

(B) Certain purposes not qualified.—Research shall in no event be treated as conducted for a purpose described in this paragraph if it relates to style, taste, cosmetic, or seasonal design factors.

This section imposes four principal requirements. To be a QRE, an expenditure must be: (1) a business expense under IRC § 174; (2) undertaken to discover technological information; (3) useful in the development of a new or improved business component; and (4) constitute elements of a process of experimentation. IRC § 41(d)(4) then enumerates a variety of purposes excluded from qualified research that are, in general, not pertinent. IRC § 41(d)(4)(A) excludes research after commercial production, and IRC § 41(d)(4)(B) excludes adaptation of an existing business component to meet a particular customer's needs.

The first two elements—business expense and technological information—are not seriously in dispute here, and the Court finds that they are established for the six projects in question.

### B. Business Component

The government argues that the ships at issue do not qualify as business components. The statute defines business components as including a product which is to be held for sale. IRC § 41(d)(2)(B). The ships at issue were built by TMG for its customer pursuant to written contracts.[3] The government apparently argues that because the ships were special order, rather than sold out of inventory, they were not "held for sale." The government cites no authority for that proposition and the Court sees nothing in the statute that would require such a narrow reading. The Court holds that after the ships were completed and before TMG conveyed them to its customers, TMG held the ships for sale within the meaning of IRC § 41(d)(2)(B)(i). The Court thus finds that each first in class ship was a business component.

This means that the only remaining question is whether "substantially all of the activities of [the research] constitute elements of a process of experimentation."

---

**3.** As indicated above, TMG was not careful in correctly naming the contracting entity. Nonetheless, the Court finds that all of the pertinent operations and expenditures during the Tax Years were undertaken by TMG.

## C. Integrating Existing Components

Much of the design work at issue involved integrating extant subassemblies into a ship design. The government suggest that this is nothing more than ordering off a menu: pick a hull from column A, a propulsion system from column B, an HVAC from column C, etc. The Court finds this greatly oversimplifies the process.

First, many of the systems at issue are not monolithic entities, but rather families of products with considerable flexibility in their configuration. Determining which configuration out of the universe available can in particular cases itself involve a significant research effort.

Second, the systems do not exist in a vacuum. They interact with each other, sometimes in complex and nonintuitive ways. A change in electronics may require a change in power generation and distribution, which may require a change in the engine plant, any one of which may affect the weight distribution and performance of the vessel as a whole.

Thus, the simple fact that a new vessel incorporates existing systems does not resolve the QRE issue against Trinity. Determining the degree of QRE involved requires an examination of the overall scope of the effort required to specify the components and integrate them into the overall design of the ship.

Conversely, the simple fact that a ship was first in class does not necessarily mean that use of a well-known component, such as an engine, constitutes a process of experimentation.

## III. ALL OR NOTHING

The first in class ships at issue here ranged from all new hull up designs to cafeteria-style mix and match combinations of existing elements to slight modifications of existing designs. Trinity did not attempt to segregate those expenses related to new aspects of the designs from tried and true elements. Rather, Trinity took an all or nothing approach to the litigation. Either the design and construction of the first in class was sufficiently experimental that the whole project constitutes QRE, or it is not. Trinity did not offer any evidence from which the Court could estimate what portion of the costs were QREs if it finds that the entire vessel does not qualify as QRE.

The government, on the other hand, insists that Trinity must break out every expense and determine whether it is a QRE; for example, the government criticized Trinity for claiming the cost of painting a first in class, pointing out that painting a ship was not experimental.

The Court conceptually agrees with Trinity. If a first in class ship is sufficiently experimental, the risk of failure attaches to the entire project. The potential loss includes not just the experimental aspects, but also the paint. The regulations support this view:

In order for activities to constitute qualified research under section 41(d)(1), substantially all of the activities must constitute elements of a process of experimentation that relates to a qualified purpose. The substantially all requirement of section 41(d)(1)(C) and paragraph (a)(2)(iii) of this section is satisfied only if 80 percent or more of a taxpayer's research activities, measured on a cost or other consistently applied reasonable basis (and without regard to section 1.41–2(d)(2)), constitute elements of a process of experimentation for a purpose described in section 41(d)(3). Accordingly, if 80 percent (or more) of a taxpayer's research activities with respect to a business component constitute elements of a process of experimentation for a purpose described in section 41(d)(3), the substantially all require-

ment is satisfied even if the remaining 20 percent (or less) of a taxpayer's research activities with respect to the business component do not constitute elements of a process of experimentation for a purpose described in section 41(d)(3), so long as these remaining research activities satisfy the requirements of section 41(d)(1)(A) and are not otherwise excluded under section 41(d)(4). The substantially all requirement is applied separately to each business component.

Treas Reg. § 1.41–4(a)(6). Thus, if Trinity can show that 80% of a first in class ship was part of a process of experimentation, it can claim the entire cost of the first in class.

The Court is faced with something of a dilemma if Trinity shows that some expenses of a first in class qualify as QRE, but not 80%. The regulations call for a progressively granular approach, until the 80% threshold is met for some subunit of the vessel. If the whole ship doesn't qualify, perhaps the new engines do; if the engines don't qualify, perhaps the new pistons do, etc.

> The requirements of section 41(d) and paragraph (a) of this section are to be applied first at the level of the discrete business component, that is, the product, process, computer software, technique, formula, or invention to be held for sale, lease, or license, or used by the taxpayer in a trade or business of the taxpayer. If these requirements are not met at that level, then they apply at the most significant subset of elements of the product, process, computer software, technique, formula, or invention to be held for sale, lease, or license. This shrinking back of the product is to continue until either a subset of elements of the product that satisfies the requirements is reached, or the most basic element of the product is reached and such element fails to satisfy the test. This shrinking-back rule is applied only if a taxpayer does not satisfy the requirements of section 41(d)(1) and paragraph (a)(2) of this section with respect to the overall business component. The shrinking-back rule is not itself applied as a reason to exclude research activities from credit eligibility.

Treas. Reg. 1.41–4(b)(2).

■ The Court finds that it cannot apply the shrinking-back rule because Trinity offered no evidence of the costs associated with any subset of the vessels.

The Court is aware of case law instructing it to estimate the amount of QRE if it determines that the taxpayer has made *some* qualified expenditure: "If the taxpayer can establish that qualified expenses occurred, however, then the court should estimate the allowable tax credit." *United States v. McFerrin*, 570 F.3d 672, 675 (5th Cir.2009) (citing *Cohan v. Comm'r*, 39 F.2d 540, 544 (2d Cir.1930)). In this case, however, Trinity did not offer any evidence from which the Court could make a meaningful estimate. The Court, therefore, finds there is no evidence from which it can estimate QREs relating to any business component smaller than an entire vessel.[4]

---

4. The Court notes the tension between the case law requiring an estimate and the shrinking-back rule. If 70% of the cost of developing a new widget were attributed to qualified research, and uniformly every subsidiary business component of the widget also incurred 70% cost attributed to qualified research, the shrinking back rule would dictate that there were no QREs in developing the widget. The estimating case law would appear to permit an estimate of 70%. The shrinking-back rule seems to be more faithful to the statutory requirement that "substantially all" of the qualified research be part of a process of experimentation. *See* IRC § 41(d)(1)(C). Due to the unusual facts before the Court, it is not necessary to resolve that tension.

The Court is not being critical of Trinity or its lawyers. At least three factors made documenting its expenses difficult. First, the expenses are remote in time; in addition to the usual problems that causes, here much of the data was maintained on computer systems no longer in use. Second, Trinity has spun off this business segment and no longer has physical custody of the records. Finally, many of the records were destroyed by Hurricane Katrina. While the Court is sympathetic to Trinity's difficulties, it remains the case that "[t]axpayers are required to retain records necessary to substantiate a claimed credit." *Id.* (citing IRC § 6001; Treas. Reg. § 1.6001–1(a), (e)).

Accordingly, the Court finds that Trinity must stand or fall on an "80% of the whole ship" basis.

## IV. THE PROJECTS

The Court will address the projects from most novel to least novel.

### A. The Mark V

The Mark V is the easiest case for Trinity. The Mark V project was a very innovative special operations deployment craft. It was designed to be very fast, undetectable, and able to fit on a C–5 cargo plane for rapid deployment. At the time of the contract, nothing like the Mark V existed in the world. Much of the complexity of the project flowed from the speed requirements. Unlike larger vessels that are relatively unaffected by wave action, the Mark V is affected by waves. At the required speed, this became a significant challenge.

Additionally, the Mark V was required to be stealthy. This involved reducing both its radar and infrared signature. Reducing the radar profile affected the surface configuration of the ship. Reducing

the infrared signature required novel changes to the engine exhaust. The Mark V also did not use a traditional propeller in order to reduce the prominent rooster tail that a propeller would cause.

Moreover, the ship had other design requirements. It had to support a variety of weaponry. It had to be able to recover a Zodiac-type auxiliary vessel on the fly— which was accomplished by a novel design of the stern that permitted the auxiliary vessel to approach the Mark V from the rear and drive aboard while the Mark V was in motion.

Finally, if the rest were not enough, TMG had to design a carrier that would secure the Mark V for loading onto and transport by a cargo plane.

TMG built two Mark V prototypes, one with an aluminum hull and one with a Kevlar hull. Due to the operational requirements of the Mark V, it was based on an all-new hull design, rather than an existing hull.[5]

■ The Court does not intend to enumerate everything about the Mark V that was new and required research expenditures, but rather to give a flavor of the effort required. The Court finds that more than 80% of the overall costs of the two Mark V prototypes were incurred in a process of experimentation and qualified research, and therefore that Trinity is entitled to claim the QRE credit for the costs of the two Mark V prototypes.

### B. The Dirty Oil Barge

In response to the Exxon Valdez oil spill, Congress enacted the Oil Pollution Act of 1990 ("OPA90"). OPA90 imposed various requirements to prevent future disastrous oil spills. Among those require-

---

**5.** TMG had developed an experimental hull, the P050. This apparently was not a complete vessel, but rather essentially a hull and engine. The Mark V hull was a derivative of the experimental P050.

ments was a mandate for double hulls in oil tank vessels. Although TMG had previously built oil barges, it had never before built a double hulled oil barge.[6] The requirement for a double hull radically altered the design of the dirty oil[7] barge relative to the single hull design. The vessel is obviously structurally different because of the second hull. In a single hull barge, the pressure of the water on the outside of the hull is somewhat offset by the pressure of the oil on the inside of the hull. A totally different structure is required in the double hull version. The double hull also alters the cargo capacity and the weight distribution inside the loaded barge, which in turn affect the vessel's stability. In addition to requiring double hulls, OPA90 also imposed more stringent stability requirements. Finally, the double hull design required that the piping and heating systems be completely redesigned.

■ The OPA90 requirements of a double hull and greater stability essentially made the dirty oil barge an all-new design from the hull up. The Court finds that more than 80% of the costs incurred in developing the dirty oil barge were part of a process of experimentation and qualified research, and therefore that Trinity is entitled to claim the QRE credit for the costs of the dirty oil barge.

## C. XFPB

The XFPB is the most difficult project for the Court to assess. TMG designed and built the XFPB for the Mexican government. The XFPB was designed to patrol coastal waters frequently used by drug smugglers. In order to intercept smugglers, the XFPB was required to reach a maximum speed of at least 50 knots.[8] In addition, the XFPB was also required to house a crew of 16 for extended periods, so the vessel had to include full living quarters rather than just seating.

The primary challenge of the XFPB was combining the speed requirement with the living quarters requirement, while meeting the durability requirements. TMG had no existing vessel that would meet those requirements, so, like the later Mark V, the XFPB was a derivative of the experimental P050 hull.

The XFPB clearly involved a process of experimentation. The high speed requirement presented a substantial design challenge. But, while the "extra fast" part was novel and uncertain, the "patrol boat" part does not appear particularly out of the ordinary. The high speed requirement did introduce greater vibration and shock from wave impact that was an issue for crew comfort, particularly given the living quarters requirement. But most of the patrol boat features appear to be fairly routine.

■ The dilemma for the Court is attempting to ascertain whether 80% of the costs incurred were part of a process of experimentation. While the Court would readily accept that a significant portion of the costs was part of a process of experi-

---

6. The idea of a double hull itself was not new, though it does not appear it was in wide use before OPA90. The fact that double hulls were known in the industry does not preclude development of a double hull oil barge by TMG from being QRE. *See* Treas. Reg. 1.41–4(a)(3)(ii).

7. From a barge design perspective, the primary difference between dirty and clean oil is that so-called dirty oil requires a heating sys-

tem to make the oil fluid enough to be pumped into and out of the barge. *See* Tr. III–71. *See also Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 372–73 (5th Cir.2000) (discussing differences between clean and dirty oil barges).

8. It appears that TMG exceeded this requirement and the XFPB actually had a maximum speed of 53 knots.

mentation, it has substantial uncertainty regarding the 80% threshold. In the face of that uncertainty, the Court somewhat reluctantly must find that Trinity has failed to meet its burden of proof. The Court therefore finds that Trinity is not entitled to any QRE credit for the XFPB.[9]

### D. T–AGS 60

The T–AGS 60[10] was a sophisticated oceanographic research ship built for the United States Navy. It included a suite of sonars, a suite of laboratories, and a suite of deck handling equipment. The Navy had relatively strict trim, noise, sea keeping and maneuverability requirements. These capabilities permit the T–AGS to launch, tow, and recover a variety of scientific instrument packages in a broad range of environmental conditions. The T–AGS, at 329 feet, were the largest self-propelled vessels that TMG had built at the time, although TMG had previously built smaller oceanographic research ships.

■ The T–AGS development plainly included qualified research, particularly in connection with internal airborne noise levels (including engine exhaust routing), sonar self noise issues, oceanographic handling (specifically the winches and cranes), and the ship handling requirements (including bow shape and retractable bow thrusters). However, most of the balance of the T–AGS was not new or different. As with the XFPB, the Court finds that Trinity has not met its burden of showing that 80% of the costs were incurred in a process of experimentation. The Court therefore finds that Trinity is not entitled to any QRE credit for the T–AGS.

### E. Crew Rescue Boat

The Crew Rescue Boat was an offshore oil field service boat built for O.I.L. Limited. Its general function was to carry personnel and a limited cargo load between shore and offshore facilities or offshore vessels operating in an oilfield. It was also designed to perform a variety of rescue operations, including fighting fires, towing stranded vessels, and rescuing people in the water. It was required to carry a crane to launch a 21' auxiliary vessel, and to meet certain speed and towing capacity ("Bollard pull") requirements. The Crew Rescue boat was a Swiss army knife sort of vessel, able to perform a variety of different functions. TMG had built many crew boats before, but had never before built a boat with this particular variety of capabilities. As a consequence of the varying requirements, TMG had to design a deeper hull than it usually used in its crew boats.

■ There were clearly some qualified research costs incurred in the design and construction of the Crew Rescue Boat. But much of the development and construction of the Crew Rescue Boat was not part of a process of experimentation. It was a process of integrating known capabilities into a single vessel. Here the integration process does not appear to have been particularly challenging. The Court finds that less than 80% of the costs incurred were part of a process of experimentation. The Court therefore finds that Trinity is not entitled to any QRE credit for the Crew Rescue Boat.

### F. Hurley Dredge

The Hurley Dredge was a dredge built for the Corps of Engineers for dredging

---

**9.** In view of this determination, the Court need not address Trinity's claim for QRE credits for the two additional XFPBs after the first in class.

**10.** T is the Navy designation for a ship with civilian crew. The "AGS" stands for auxiliary geophysical survey.

operations in the Mississippi River. The Hurley Dredge had an appendage shaped similarly to a large dustpan (a "ladder") at the bow that could be lowered to adjustable dredging depths to scoop up the dredged material off the river bottom. The Hurley Dredge was a refinement of a preliminary design provided by the Corps of Engineers. The primary changes made by TMG to the Corps of Engineers design were: (1) redesign the impeller and cover to be removable; (2) redesign the hatches over the Z drives; (3) update the electrical system; (4) modify the winches that raise and lower the ladder; and (5) revise the control system for the bow and Z thrusters.

■ The changes TMG made to the Corps of Engineers design involved qualified research costs. Those changes, however, were small in comparison to the overall project. The Court finds that less than 80% of the costs incurred were part of a process of experimentation. There Court therefore finds that Trinity is not entitled to any QRE credit for the Hurley Dredge.[11]

### V. The Amount of Credit

The government objects to Trinity's calculation of the QRE credit, pointing out various items in Trinity's claim that are not properly considered QRE, such as insurance. The implication is that the Court should scour the records and determine which line items are for matters not properly considered QRE. The Court believes this is an issue the 80% rule of Treas. Reg. 1.41–4(a)(6) is intended to address. The Court finds that the additional expenses the government cites are properly considered research expenditures in that the business component—the ship—could not have been developed without them.

Under the 80% rule, the Court finds that those costs are properly included in QRE for the Mark V and the Dirty Oil Barge.

The government also points to certain inconsistencies between the testimony of James Bennett and the exhibits. The Court finds that Bennett's testimony reasonably estimates the QRE and that the documentation upon which he bases his report and testimony are sufficiently reliable to support the claimed credit, with one exception. The testimony showed that TMG's accounting system categorized certain subcontracting expenses as material, which should therefore be included at 65% rather than 100%. With regard to the Mark V those subcontracting expenses include: Guard Service, Plaisance, TESI, Additional Technical, and U.S. Marine, Inc. After removing the first four items from the material costs, the Court finds that 75% of the remaining material costs should be attributed to U.S. Marine, Inc. on the G213, and 5% of the remaining material costs should be attributed to U.S. Marine, Inc. on the G214. The Court finds that there were no significant miscategorizations of subcontract charges as materials on the Dirty Oil Barge.

### CONCLUSION

The Court directs the parties to confer and attempt to reach agreement regarding the appropriate dollar amount of credit consistent with the determinations in this Order. If the parties are unable to agree on the dollar amount, the Court grants leave for the parties to file supplemental briefs addressing that calculation, based on the current state of the evidentiary record, no later than March 15, 2010.

---

11. In the alternative, the Court holds that the research involved in the Hurley Dredge is excluded under IRC § 41(d)(4)(B) as adapting

an existing business component to a particular customer's needs.